Final oral argument of the day is docket number 25-1998, ReCor Medical v. Medtronic Ireland. Mr. Kastanis, whenever you're ready. Good afternoon. And may it please the Court. The district court in this case erred by holding that the patent owner, Medtronic Ireland, did not have constitutional standing under Article III to bring its counterclaims for patent infringement. Medtronic Ireland had and pleaded an injury in fact caused by recourse conduct that a favorable federal judgment would redress. In zebra technologies this court held, in general, the question for the injury in fact threshold is whether a party has an exclusionary right. Just one such right will be sufficient. And it held in that case that the patent owner, like Medtronic Ireland here, possesses exclusionary rights as a baseline matter unless it is transferred all exclusionary rights away. Here, Medtronic Ireland did not transfer all of its exclusionary rights away in the license agreement. How would you define exclusionary right? Well, this court has made clear that it's not ready to say the entirety of exclusionary rights. But what it has said is that there are two general aspects of exclusionary rights, one of which is literally the right granted by a patent, the right to exclude, the right to sue for infringement, and also the right to alienate a patent. And those are possessed by Medtronic Ireland even after the ELA in this case. But I thought the ELA quite clearly says that it's Galway that has the exclusive right to exclude others from making, using, selling, et cetera, and also I think the exclusive right to license or sub-license, practicing. So I think both of those are incomplete statements, Judge Chet, and let me walk you through the agreement here. This is really important. In Sections 2.1 and 2.2, and these are the provisions, this is in Appendix 3643, these are the two provisions that my friends on the other side put the most weight on. And it says that the preceding license grant includes the exclusive right to exclude others from using, making, or having made, but here's the term that's really important here, product. It's a defined term in this patent, in this ELA, excuse me. Product, capital P, that infringes any patent claims. So let's take a page back now to Section 1.9 and the definition of product. Product shall mean any finished medical device as specifically designated by licensor, that's Medtronic Ireland, and agreed to by licensee for the sale into the medical field. So Medtronic Ireland here even controls what the scope of the Section 2.1 and 2.2 grant is by having the specific designation power here. That's an exclusionary right in and of itself, but if you further then say, okay, Medtronic Ireland has granted the right to exclude with respect to, say, the simplicity renal denervation system that is at the core of this case, then Medtronic Ireland still holds other exclusionary rights, all of those not associated with the designated product. That might include, for example, a developmental activity, a product that is not that particular product. There are lots of rights here. Now, Judge Chen, you also asked me about the right to sublicense. Let's take a look at that. That's in Section 2.4. Section 2.4 says, in addition to the rights set forth in Article 2.3, which is the uninterrupted supply provision, licensee may sublicense the rights granted in Article 2.1, subject to licensor's prior written consent. At best, this is… Not to be unreasonably withheld. Not to be unreasonably withheld, but at best, this is a shared sublicensing right. And we know from Lone Star that a shared sublicensing right is enough of a right to get over the hump of Article 3 jurisdiction for purposes of a case or controversy. I'm not sure what shared sublicensing right means. I don't think there's anything here that grants or allows Ireland on its own to do any licensing or sublicensing. Is that correct? Well, what it does do is allow Medtronic Ireland to say no to Medtronic Galway. Let's say Medtronic Galway decided that it wanted to sue RECOR itself. First of all, that takes us to… But I guess the point is, if Ireland decided, well, you know, Johnson & Johnson is making me a pretty good deal here. I want to license these patents to Johnson & Johnson. That would be a violation of this agreement, right? It might be, but that would be a question between Medtronic Ireland and Medtronic Galway. And, of course, it would also have to do with regard to… But you're just talking about based just on the terms of this agreement. Right. Well, it would also have to – right. But the terms of the agreement also include what we were just talking about, which is product. And we'd have to determine at that point whether the license actually is covering the product that has been previously designated in the judgment of Medtronic Ireland. And, by the way… So I understand your argument. Your argument doesn't exclusively hinge on product, right? No, no, not at all. That's one argument that you think is a winner. But you have, aside from that, separate and independent from product. We have a number of them. We can turn to Section 3.6. And 3.6 is really, I think, where the rubber meets the road with regard to understanding that Medtronic Ireland retains at least one right. Because here the parties recognize that even if Medtronic Galway wants to sue somebody, it has to get Medtronic Ireland involved. Because it's the patent donor. Because it has still some rights that have to be part of the case. The only way Medtronic Galway could sue by itself is if this were a case like Azure, which it's not. But that might be for statutory standing purposes, not for constitutional standing purposes. Well, even after Lone Star, we understand that there is some relationship, at least in some of this Court's cases, between the statutory requirements… Our precedent is not a model of clarity. It is not. I grant you. But I'd like to help… The problem is us. Well, I'd like to help be part of the solution. And let me see if I can help be part of the solution. What happened in the pre-Lexmark, pre-Lone Star cases, like Wyeth, like Morrow, is that in both cases the Court relied upon language from the Supreme Court in Worth v. Selden. Now, what Worth v. Selden said is that when Congress creates a statutory right, then that may expand the scope of injury in fact. But what my friends are arguing is that Wyeth, Morrow, and the other cases that are not a model of clarity actually say that's the limits of Article III. That's not the limit of Article III. That's an expansion of what an injury in fact is done by Congress. I understand your Worth argument. But in the end, we're still bound by our own precedent here. And so we are living with Morrow and Wyeth. And so then the next question becomes, okay, you're pointing me to Provision 3.6. It gives you a secondary right to sue. But Morrow, that particular trustee, had a right to sue as well. And the conclusion was that you had the right to sue, but this other trustee had everything else, all the other rights, all the other sticks in the bundle. And so your bare right to sue is not enough for constitutional standing. Well, first of all, it's hardly a bare right to sue, nor is it entirely secondary. Note that even if Galway ---- We're talking about the facts here. Yes, I'm talking about this particular agreement. Because in Section 3.6, remember that even if Galway wants to go forward with a suit, then it still has to join Ireland. And if it doesn't do it, then we're in exactly the situation that this case presented, which is Ireland was not satisfied that Galway had acted fast enough, so it sued in its own name. What you referred to earlier as secondary, I dispute the characterization, but I can live with it for purposes of this argument. Because it is if Galway does not decide to sue. But the point is here that this agreement anticipates that Medtronic Ireland can sue by itself. And it anticipates that because Medtronic Ireland has exclusionary rights. It has ownership rights and it has exclusionary rights. Hold on a second. Why do we get to say that this right to sue, we'll call it a secondary right to sue, counts as an exclusionary right when we know from Moro that that particular right to sue did not count as an exclusionary right? Well, but remember that in Moro you were not dealing with the patent owner as the party having their Article 3 jurisdiction challenged. In Moro, what was missing was the combination of rights that we have here. Medtronic Ireland has ownership, legal title. That was separate from the right to sue in Moro. Medtronic Ireland has a right to sue. At least it's a shared or even secondary right to sue, but it's a right to sue. And it was in fact exercised in this case. And then go on and then you have the classic Article 3 injury in fact question, which is a right to damages, a right to royalties, and a right to share in the proceeds of every infringement suit that is either one initiated by Galway with Ireland as a party or initiated by Ireland going by itself. Wouldn't the trustee in Moro have those same, enjoy those same rights? No, because the trustee in Moro didn't have ownership of the patent. But they wouldn't collect damages for any or any damages award from any lawsuit through its right to sue? Well, again, and I think this is why Moro is difficult to understand in a post-Lone Star world because Moro was so hung up on the notion that there was nobody who could sue. Remember that in Moro, both of the trusts were actually parties in the case, although the trust starting with an A was joined later to the lawsuit. Let me ask you this about Moro. Could after the G trustee filed the lawsuit, could the A trustee retain the right to license that defendant in the lawsuit? Honestly, I don't remember the facts in Moro with regard to that particular aspect of the agreement. But here's what I can tell you is that what the court said in Moro is that for any suit that the G trust brings, its grievance is that the exclusionary interests held by the A trust are being violated. That was what was separated in that case. We have those all together here. These are our exclusionary rights and they're being violated and the damages are traceable directly to the damages from the infringement. Now, I see I'm into my rebuttal time, but unless the court has further questions for me, I'll come back on rebuttal. I do, so no sitting just yet. Okay, that's fine. The presiding judge, thank you. Coming back to your product definition argument, first of all, did you articulate that argument to the district court as you have to us? I think we probably expanded it here, but I think we've articulated it to the district court and, of course, this is. Do you think it's addressed by the district court? I don't think it's addressed by the district court. If I understand it correctly, I think you're saying that if the scope of any of the claims of your patent are however large, you only ever licensed, that is Ireland only licensed to Galway, some subset of a full patent claim. Is that a fair way to think about what you're arguing? I don't think it's quite right. I think what we're arguing is that the scope of the license, and again, we just come back to the language of 2.1. It's the exclusive right to exclude others from using, making, or having made product. Well, again, with Medtronic Ireland controlling the definition of product here, product for purposes of what somebody else is making could be different than the simplicity product that they've licensed Medtronic Galway to make, use, sell, import, et cetera, in sections 2.1 and 2.2. Does it apply, though, that there's some part of at least one patent claim that you're arguing Ireland retained complete control over and didn't license any portion because it's not part of the product? We haven't articulated a particular patent claim, and that might or might not be the case, that it is on a claim-by-claim basis. But it also could be that it just has to do with a product that's covered by all of the claims, but not other sets of products that also might be covered by some or all of those claims. Two more quick, if I might, just real quick. It's suggested in the red brief that you're relying on some sort of inherent or unenumerated exclusionary rights just by virtue of being the patent owner. Is that true, or can we just limit our analysis to the rights you're expressly telling us you think you have? Well, no, because I think that, remember, Zebra says that a patent owner has all rights as a baseline matter, and then an agreement only licenses the rights that it licenses. So whatever we hold that wasn't licensed is, in fact, a retained right. So in that regard, they are right. Could you articulate one of them to us, I guess? How do I know what's in your mind as an unenumerated right of ownership? Well, an unenumerated right of ownership here might be, for example, to I'm trying to think of sort of the clearest example of this.  Well, I think that's actually a very good one, because this agreement does not give, and that's an important point here as well, Judge Chin, this agreement does not give Galway the right to assign any patent. In fact, there's a non-assignment provision in the agreement, and the non-assignment agreement only talks about intellectual property rights generally. It does not even anticipate that Galway is in any way the owner of these patents. In addition, I think there's another not quite enumerated right, Judge Stark, and I'll just close on this one, and that is that because we have the right to participate in litigation under Section 3.6, I think there's an implicit right to settle litigation like that as well. That's clearly exclusionary, and I hope the Court will give me a few moments of rebuttal. Thank you. Mr. Castanhas, please don't go away. I'm here for you, Your Honor. You filed a second lawsuit somewhere? We did, in the same court. What's going on with that? Well, the Court is eagerly anticipating this Court's decision because It's going to wait for us? Well, it has not stayed the matter, but it is asking for updates. The judge, as I understand it, was very happy to hear that this case had been expedited for argument. On top of that, though, We just need to know if that judge is going to make a ruling while we percolate over here on a decision. Well, I don't think that court is going to make any ruling that has an effect on this case because that new case, as we pointed out in our briefs, is on a revised license agreement that addresses the problems that the district court had with this agreement. Now, Medtronic would like to go back to the original agreement, and I think I can represent here it would go back to the original agreement. I guess what I'm wondering is, from your Medtronic Ireland's perspective, what is to be gained by holding on to this litigation if you're allowed to go forward with that litigation? There are serious questions with regard to damages and what the look-back period would be. In addition to that, we are facing currently, and this is one of the things that we would, you know, the Court will, I'm sure, be eagerly listening to this argument here. We are also facing a motion to dismiss the second case on the ground of claim splitting. Now, I confess I'm not litigating the case in the district court, but I do confess that it's sort of hard to understand how a dismissal without prejudice on jurisdictional grounds can somehow be a claim splitting issue, but I'm not smart enough to understand that argument. And now here's my last question.  The red brief somewhere contends that under this agreement, Ireland doesn't have the right to end any lawsuit it initiates through a license. Do you agree with that? I don't agree with that. If we initiate, particularly if we initiate solely as the sole plaintiff under what we've referred to colloquially as the secondary right in 3.6, of course, as plaintiff, we can end the lawsuit. With a license? Absolutely. I think that's one of those things that is at the very least implicit in the grant of the right to participate in litigation, including participating with our own counsel separate from Galway. Okay. All right. Thank you very much. We'll leave you a little time for rebuttal. Let's hear from the other side. Ms. Frey. Okay. I don't know. 20 minutes. If she needs it. Maybe not. Thank you, Your Honors. Good afternoon. Ashley Frey of Latham & Watkins on behalf of the Appellee ReCore. ReCore requests an affirmance of the district court's dismissal order. The question before this court is whether Ireland held an exclusionary right at the time it filed its infringement counterclaims against ReCore. And based on the plain text of the license agreement, including Articles 2.1 and 2.2, the answer is no. I'll address first the argument raised by Ireland's counsel about Article 1.9 and the definition of product. To Judge Stark's question on whether that argument was articulated to the district court, the answer is no. In Ireland's briefing below, it never cited Article 1.9. And in fact, in its opening brief on appeal, Ireland does point to Article 1.9, but ellipses out the language about Ireland's specific products being specifically designated. But at least at pages 14 and 15 of their opening brief, they do cite 1.9 here and then they elaborate on it in the reply brief. That's here. But you're saying if I look at the district court briefs, I won't see even a citation to 1.9? We didn't see a citation to 1.9 or an argument based on the scope of Articles 2.1 and 2.2 based on the definition of product. And in fact, just looking at the merits and turning to the merits, Article 1.9 is not forward-looking. It's not about rights that Ireland has retained to specifically designate products in the future. That provision is backwards-looking. It's stating the products that Ireland has already designated as of the execution of the agreement. And those are the products that are coextensive with the scope of the patents here, these catheter-based treatments for hypertension and related conditions. My understanding of the other side's argument is these claims are broad enough to cover all sorts of embodiments. And this agreement is limited to specifically defined pre-approved embodiments. And so to that extent, any and all other non-approved embodiments are portions of the claim scope that are completely retained by Ireland. I think I am following Ireland's position there, but what matters here is that the definition of product includes products for catheter, and I'm making sure I have the language right, products for catheter-based therapies to treat hypertension and related conditions. The 629 patent and 085 patent claims are coextensive with that definition of product. They cover all embodiments within that, and those are the patents at issue in this case. It is true that the definition of product could be broader, but when read in light of Articles 2.1 and 2.2, what's relevant is Galway has the exclusive right to exclude others from infringing these patents. Okay. I might need to hear it one more time. I understand the other side's position, which is these patent rights are due to certain patent claims that cover all kinds of embodiments. And this product definition makes it clear that what is being licensed exclusively to Galway are just certain embodiments that they have specifically approved. Is that a correct understanding of what's going on? That's not how I read the scope of Article 1.9 as that narrow, and I do not see it as limiting Galway's rights to only excluding particular embodiments. I read it as a fairly broad definition to not limit the scope of Articles 2.1 or 2.2. So what does it mean by specifically designated by licensor? That Ireland, as of the execution of this agreement, has designated product to mean products including, I'm sorry, products including products for catheter-based therapies to treat hypertension-related conditions. So basically products that fall within the scope of the asserted claims here. Okay. I guess coming back to where you and I started, are you arguing that reliance on 1.9 is waived or forfeited? And maybe this is your first chance to say that, but I haven't seen that argument itself made that there's waiver or forfeiture here. Sure. So this only first came up in the Gray Brief, so RECOR never had a chance to articulate its position in writing. I think the court can decide jurisdiction sort of on its own and based on the full scope of the agreement. And so if the court were to consider the argument, I think it fails on the merits, but I also think it could be considered waived or forfeited. So in addition, Ireland's council has argued today and in the briefing that Article 2.4 is a shared sub-licensing right, and that's not at all the case based on the plain text of Articles 2.4, and in particular when read in conjunction with Article 2.5. So under Article 2.4, only Galway can sub-license the rights. With Ireland's prior written consent, which cannot be unreasonably withheld, and in this court's decision in Morrow, which in turn relied on this court's decisions in Speedplay and Volpil, that language unreasonably withheld is key here, and it does not provide a significant restriction on Galway's exclusionary right, and it is not itself an exclusionary right. I guess the not unreasonably withheld language, I think it's probably fair to assume that if Ireland were to initiate an infringement lawsuit, that Galway would not be able to issue a sub-license to the defendant in that infringement suit because it wouldn't be unreasonable for Ireland to withhold consent to such a sub-license. Is that fair to say? I disagree. So I found guidance in this court's decision in Speedplay in defining what it means to be a reasonable withholding of consent, and there the court stated that licensors' only reasonable basis for refusing consent would be the impairment of its consideration for entering into the agreement. And Ireland's consideration for entering into this agreement is set forth in Article 6.1. So if Ireland filed a lawsuit against Johnson & Johnson, and then Galway swept in and wanted to grant a royalty-free sub-license to Johnson & Johnson, you're saying it would be unreasonable for Ireland to withhold its consent to Galway's attempted royalty-free sub-license to the defendant? The agreement here allows Galway to grant royalty-free sub-licenses. There's actually no provision that allows Ireland to get payment from— I guess you are saying that it would be totally unreasonable for Ireland to refuse to consent to Galway's attempted sub-license of the defendant royalty-free. In that hypothetical, I'm not sure. I just find guidance from this court's precedent on what it means to be reasonable or not. And here, as in Morrow and in Speedplay and Valpo, the court has not determined that a right to withhold consent is an exclusionary right for Article 3 standing purposes. Now— The Blue Brief at 40 argues that if RECOR had requested a sub-license from Galway during the course of this litigation, Ireland would have had the power to veto such a request in order to exclude RECOR from practicing the asserted patents. Do you agree or disagree? Ireland does have the right to withhold consent. And so whether that's considered reasonable or not, the guidance I have is from this court's decision. But why shouldn't we view that as an exclusionary right? Because this court in Morrow has already rejected the same contract language about the licensor merely being—providing consent that cannot be unreasonably withheld, that that's not enough in and of itself to be an exclusionary right. It doesn't impair the one holding the exclusionary right, that their exercise of that right. It is not significantly restrictive enough. And I think based on the guidance in Morrow, we can say that this similar contract language is not enough of an impairment of Galway's exclusionary right to, in and of itself, be an exclusionary right. So our case law is admittedly a little convoluted, but we also have this Mann case, which is about statutory standing technically, not constitutional standing. I'm not convinced that we can silo those two inquiries off from each other. And so if a case is about statutory standing, it absolutely cannot be consulted for constitutional standing purposes. I don't agree with that. But especially given that this recent Zebratech opinion cited the facts of Mann with approval in the context of Zebratech's constitutional standing analysis, and I'm just wondering why wouldn't it be correct to understand that we've already crossed the bridge, so to speak, in bridging the Mann case into a constitutional standing context. And if the Mann facts line up pretty closely to the facts here, then maybe what we need to do is reverse and find constitutional standing in this context. Correct that this court in Zebratech's includes a C also citation of Mann in the context of addressing constitutional standing. But this court in Zebratech's did not say that the Alfred E. Mann decision controls the analysis for injury in fact for constitutional standing. But it noted that there were similarities in facts between this court's and the statutory requirements to be a patentee. And if those facts were similar to an analysis, that case could have bearing. And that's what happened with Zebratech's citation to Alfred E. Mann. It was critical there because in Alfred E. Mann, the licensor and the licensee had a shared ability to license. Those are not the facts here. But they were the facts in Zebratech's, which is why the court considered it relevant to cite the facts of Alfred E. Mann because it had bearing on the analysis. But there's also dis- I thought Mann also had this secondary right to sue, correct? Correct. There was a secondary right to sue in Alfred E.  but there was no suggestion that the licensor there had contractually separated the underlying legally protected interest from the right to sue, as is what happened in Morrow and as what happened in this case. I think there's another distinguishing fact about Alfred E.  There, the licensor had the ability to dictate settlement terms and to grant a license to forgive infringement. And as this court has stated in Lone Star and other post-Lexmark cases, that sort of implicit in the right to exclude is the right to forgive. And one of the really important exclusionary rights is this right to grant a license, which under Article 2.5 of the Exclusive License Agreement here, Iron Lizard is prohibited from granting sub-licenses. And so we do think that- Oh, sorry. As I understand it from the provisions, Ireland does have the right to settle litigation it initiates. Isn't that right? There is no provision in the Exclusive License Agreement that says that Ireland has the right to settle litigation. Well, there's a settlement provision in the agreement. And then there's a statement about how whatever settlement amounts there are that the proceeds would be, I guess, divvied up between Ireland and Galway. So I think, you know, embedded in that must be the power to settle the lawsuit that you initiated. We don't read Article 3.6B to give Ireland some sort of implicit right to settle litigation, especially through granting a license. So are you saying then that, although the agreement gives or allows Ireland to retain this secondary right to sue, even in that circumstance, Ireland lacks the power to settle the case? It lacks the power to settle the case through granting a license. Theoretically, it could, after bringing a lawsuit, which under the contract it's given itself the right to do that, it could resolve the case through voluntarily dismissing it. But the agreement prohibits Ireland from granting a license to forgive infringement. And that's critical here in terms of understanding whether it has retained an exclusionary right. So then the settlement provision and then the discussion of divvying up the proceeds between Ireland and Galway, I'm not sure what it means because it seems to contemplate pretty clearly that there's going to be a block of money that gets thrown Ireland's way when Ireland settles the case. Am I wrong? I think that's a reasonable interpretation that Ireland could collect damages resulting from an infringement lawsuit, but this court has never held that a mere collection of damages is an exclusionary right. And one point on damages, and I know that Ireland's counsel raised the fact that they have a asserted or pled in their counterclaims, a damages claim. They've actually never pled lost royalties or a diminishment of their royalties from Galway in their counterclaims. Their counterclaims are silent as to Galway, this exclusive license, royalties. They merely restate what Section 284 of the Patent Act provides in terms of the types of damages that flow from the violation of an exclusionary right. And here Ireland doesn't have an exclusionary right that RECOR could invade. And I think that just going back on Morrow, it is not one of the decisions that conflated the statutory requirements under Section 281 with the injury in fact inquiry for constitutional standing. The court actually was very clear in discussing prudential concerns and whether the missing patent holder there had retained legal title versus addressing whether the plaintiff had exclusionary rights. So it's not a decision that was applying the incorrect standard. In fact, in Lone Star and in University of South Research Florida, this court has continued to cite Morrow in its discussion of exclusionary rights as well as multiple district courts have found guidance from Morrow in the context of the licensee context including the District of Delaware in Zydex as well as the Southern District of Iowa in the Deer case. Can we get your view on the impact, if any, of the new lawsuit? You argued in the red brief that if the motion to dismiss that case is denied, it would moot this appeal. But your friend on the other side clearly disagrees with that, at least for reasons relating to the damages window. What's your response to that? So we do think that there is a mootness issue, given that the second lawsuit, which asserts the same claims against the same party and the same accused product, that that case renders this appeal moot. Only if it goes forward, if you lose your motion to dismiss. Correct, if it goes forward. And we're still waiting for a decision, and we will submit it to the court once the district court rules. We had a hearing last Tuesday on it. Why would it be moot if the look-back period for damages is different? The look-back period for damages is the same in this case and in that second case. But it goes from different time periods of the complaint, right? Correct. But our company's product launched in the United States in 2023. So the six-year look-back would encompass. It would cover both. It would cover both.  Yeah. And then in response to our flagging mootness to the court in our red brief, the gray brief didn't articulate sort of any of the reasons why this appeal wouldn't be moot in light of the new case. And so we do think that that's an issue here. We wanted to bring it to the court's attention. I do think that on another point that opposing counsel has raised on assignments, we think actually Article 11 on Appendix Page 3648 gives Galway the right to  Ireland has to provide prior written consent just as with sub-licenses where that consent cannot be unreasonably withheld. And as I've explained under this court's precedent, the requirement that consent not be unreasonably withheld is not significantly restrictive of Galway's exclusionary rights here. A right to assign the license? Is that what you're talking about? Right. So Article. What page? This is on 3648 at the very bottom, Article 11. It's titled Assignment of Intellectual Property. Okay. Does Ireland retain the right to assign the patent? Ireland does not retain the right to assign the patent. Galway has the right to assign, provided it has Ireland's prior written consent. There is no provision in this contract that gives Ireland the right to assign or license the patents. But wouldn't it retain that as owner unless it expressly assigns those rights to the licensee? But it has assigned those, it has transferred those rights to the licensee through Article 11. I think just to close the loop. So we do think that the assignment of the patent is subject to the exclusive license agreement. And I think, and while opposing counsel has focused on the fact that Ireland is the patent owner here, whereas the plaintiff in Morrow was not the patent owner, I think that does delve into the, crosses the line into the statutory requirements under Section 281. It was actually irrelevant to this court's analysis in Morrow that the plaintiff did not technically have legal title to the patent. And so we think that that's an irrelevant point of focus. And I know I only have 15 seconds left. I'm happy to answer any remaining questions of the court, or I will see the rest of my time. Thank you. Thank you very much. Thank you, Your Honor. My friend, I want to pick up where my friend left off, and that is by making the same mistake that we believe the district court made in this case. And that is treating this case as though Medtronic Ireland is not the patent owner, but the licensee, and saying, well, there's nothing specific in the license agreement that gives them this right, so they don't have that right. We retain... The difference is that you're the patentee, and you had all the rights, and you retain whatever you didn't give away. Exactly, and that's... There's a difference between patentee cases from our court and licensee cases, and that's why we messed it up, because we blurred the line between those two things. I think that's exactly right, Judge Hughes, and I think that also, by the way, answers Judge Stark's questions to my friend about the notion of waiver. But to be fair to the other side, what matters is the substance of what was... What were the rights that were handed over, and what are the substance of the rights that you retain? So, yes, we have talked about the criticality of patent owner versus licensee, but at the same time, we've also talked about the importance of focusing on the substance. So my friend left off with Article 11 and tried to say that that gives them the right, or I'm sorry, not gives them, but gives Galloway the right to assign this patent. But that's not true, because look at Article 9. Article 9 is where the parties acknowledge. Licensee acknowledges licensor's rights in the intellectual property. Their argument is that we don't have any rights, that we gave them all to Galloway, and that's just not true. It's very clear from this agreement that we retained, as the patent owner, at least some, some exclusionary rights, and that's why the judgment of the district court should be reversed. I want to come back to Judge Stark for a second, because he had a colloquy with my friend about waiver. In our opening brief, Your Honor, you're right to point out pages 14 and 15, where we highlight the product language, but it also goes hand in glove with the argument that we made at page 40 to 41, which is exactly the point that Judge Hughes made, which is we retain all rights that we didn't expressly grant. And the product provision, which we elaborate on in our reply brief, makes clear that we didn't grant rights to everything across the world. We gave rights to something that was limited, and importantly under Section 1.9, in our control, in Ireland's unilateral control to define what product is. And can you point to anywhere where you made the argument below, and if not, does that matter? I can't and it doesn't, and the reason that it doesn't is that we're here on Article III jurisdiction that's not waivable. And then I'm just worrying whether this case can get mooted by what's going on, and why not, on the damages point or some other point. Well, I think one thing I was thinking about here was there's a footnote in the Supreme Court case of ExxonMobil versus Saudi Basic Industries. It's a case I argued, which is why it comes to my mind, that says that where there's parallel litigation because one side is going to continue to pursue something, that doesn't moot out the case. I think if you'll take a look at that, that's a case law answer to my friend's argument. The factual answer on this record to my friend's argument is that we don't want the new license agreement. We want to go back to this one because that's the pattern license agreement that, frankly, Mann endorses and that we have other license agreements I won't go into great detail on. Ms. Fry said something about how Mann is distinguishable on the facts from this case because in Mann the two sides had shared licensing rights, whereas you don't have that here. Well, I think we do. I think because the licensing rights that are present in this agreement are subject to our consent, so they are shared. And we possess, by the way, any other licensing rights that aren't explicitly granted. And keep in mind that the scope of all the rights granted by this agreement are limited to the product. Judge Chen, your Johnson & Johnson hypothetical demonstrates why we have at least one, but actually several, exclusionary rights. Thank you for your indulgence at the end of a long day. Your colleague has something to say. I'm sorry. Excuse me. Zebra says shared licensing right. I'm told that I mistakenly said Mann. Very good. Thank you. Thank you. Well argued. Case is submitted.